UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND


TAMARA JOSEPH                          :
                                       :
            v.                         :        C.A. No. 11-191S
                                       :
MICHAEL J. ASTRUE                      :
Commissioner of the Social Security    :
Administration                         :


## REPORT AND RECOMMENDATION

Lincoln D. Almond, United States Magistrate Judge


    This matter is before the Court for judicial review of a final decision of the Commissioner

of the Social Security Administration ("Commissioner") denying Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"), 42

U.S.C. § 405(g).  Plaintiff filed her Complaint on May 10, 2011 seeking to reverse the decision of

the Commissioner.  On December 29, 2011, Plaintiff filed a Motion to Reverse Without or,

Alternatively, With a Remand for a Rehearing the Commissioner's Final Decision.  (Document No.

7).  On March 15, 2012, the Commissioner filed a Motion for an Order Affirming the Decision of

the Commissioner.  (Document No. 11).  Plaintiff replied on March 27, 2012.  (Document No. 13).

    This matter has been referred to me for preliminary review, findings and recommended

disposition. 28 U.S.C. § 636(b)(1)(B); LR Cv 72.  Based upon my review of the record, the parties'

submissions and independent legal research, I find that there is not substantial evidence in this

record to support the Commissioner's decision and findings that Plaintiff is not disabled within the

meaning of the Act.  Consequently, I recommend that the Commissioner's Motion for an Order

Affirming the Decision of the Commissioner (Document No. 11) be DENIED and that Plaintiff's

Motion to Reverse Without or, Alternatively, With a Remand for a Rehearing the Commissioner's Final Decision (Document No. 7) be GRANTED.

## I.     PROCEDURAL HISTORY

Plaintiff filed applications for SSI (Tr. 111-116) and DIB (Tr. 117-120) on April 3, 2006 alleging disability since 1959 but amended her onset date to March 1988 at her administrative hearing. (Tr. 39). Her date last insured for DIB is September 30, 1990. (Tr. 131). The applications were denied initially on June 14, 2007 (Tr. 75-81) and on reconsideration on December 11, 2007. (Tr. 83-88). On June 9, 2008, Plaintiff requested an administrative hearing. (Tr. 89). On March 10, 2009, a hearing was held before Administrative Law Judge Barry H. Best (the "ALJ") at which time Plaintiff, represented by counsel, her maternal aunt, and a Vocational Expert ("VE") appeared and testified. (Tr. 35-66). The ALJ issued a decision unfavorable to Plaintiff on April 29, 2009. (Tr. 22-34).

Plaintiff filed a request for review (Tr. 20) and submitted additional evidence to the Appeals Council which included the report of a consultative psychological evaluation in October 2009, six months after the ALJ's decision, (Tr. 522-529), evidence relating to a hospitalization in 1964, (Tr. 530-542) and a re-submission of evidence from Brigham and Women's Hospital for the period from 1988 through 1997. (Tr. 543-616). On January 25, 2011, the Appeals Council denied Plaintiff's request for review and therefore the ALJ's decision became final. (Tr. 7-9). A timely appeal was then filed with this Court.

## II.     THE PARTIES' POSITIONS

Plaintiff argues for several reasons that the ALJ's various findings and denial of disability benefits are not supported by substantial evidence.

The Commissioner disputes Plaintiff's claims and argues that the ALJ's findings are supported by substantial evidence and thus must be affirmed.

### III.    THE STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

Where the Commissioner's decision is supported by substantial evidence, the court must affirm, even if the court would have reached a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).  The court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

The court must reverse the ALJ's decision on plenary review, however, if the ALJ applies incorrect law, or if the ALJ fails to provide the court with sufficient reasoning to determine that he or she properly applied the law.  Nguyen v. Chater, 172 F.3d  31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  Remand is unnecessary where

all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled. Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) citing, Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985).

The court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. Seavey, 276 F.3d at 8. To remand under sentence four, the court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Id.; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow her to explain the basis for her decision. Freeman v. Barnhart, 274 F.3d 606, 609-610 (1st Cir. 2001). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council). After a sentence four remand, the court enters a final and appealable judgment immediately, and thus loses jurisdiction. Freeman, 274 F.3d at 610.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court...may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level.  See <u>Jackson v. Chater</u>, 99 F.3d 1086, 1090-1092 (11th Cir. 1996).

A sentence six remand may be warranted, even in the absence of an error by the Commissioner, if new, material evidence becomes available to the claimant.  <u>Id.</u>  With a sentence six remand, the parties must return to the court after remand to file modified findings of fact.  <u>Id.</u> The court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.  <u>Id.</u>

## IV.    THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

### A.    Treating Physicians

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  See <u>Rohrberg v. Apfel</u>, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the

nature and severity of a claimant's impairments, is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. See Keating v. Sec'y of Health and Human Servs., 848 F.2d 271, 275-276 (1st Cir. 1988).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed

impairment, a claimant's residual functional capacity (see 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the province of the Commissioner.  20 C.F.R. § 404.1527(e).  See also Dudley v. Sec'y of Health and Human Servs., 816 F.2d 792, 794 (1st Cir. 1987).

### B.      Developing the Record

The ALJ has a duty to fully and fairly develop the record.    Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right if counsel is not retained.  See 42 U.S.C. § 406; Evangelista v. Sec'y of Health and Human Servs., 826 F.2d 136, 142 (1st Cir. 1987).  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  Id.  However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  See Heggarty, 947  F.2d at 997,  citing Currier v. Sec'y of Health Educ. and Welfare, 612 F.2d 594, 598 (1st Cir. 1980).

### C.      Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; see also Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to

enable the ALJ to render an informed decision. <u>Carrillo Marin v. Sec'y of Health and Human</u> <u>Servs.</u>, 758 F.2d 14, 17 (1st Cir. 1985).

### D. The Five-step Evaluation

The ALJ must follow five steps in evaluating a claim of disability. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f). Significantly, the claimant bears the burden of proof at steps one through four, but the Commissioner bears the burden at step five. <u>Wells v. Barnhart</u>, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five-step process applies to both SSDI and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). Accordingly, the ALJ must make specific and well-articulated findings

as to the effect of a combination of impairments when determining whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant bears the ultimate burden of proving the existence of a disability as defined by the Social Security Act. Seavey, 276 F.3d at 5. The claimant must prove disability on or before the last day of her insured status for the purposes of disability benefits. Deblois v. Sec'y of Health and Human Servs., 686 F.2d 76 (1st Cir. 1982), 42 U.S.C. §§ 416(i)(3), 423(a), (c). If a claimant becomes disabled after she has lost insured status, her claim for disability benefits must be denied despite her disability. Id.

**E.      Other Work**

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. Seavey, 276 F.3d at 5. In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines (the "grids"). Seavey, 276 F.3d at 5. Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. Id.; see also Heckler v. Campbell, 461 U.S. 458, 103 S. Ct. 1952, 76 L.Ed.2d 66 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills. Nguyen, 172 F.3d at 36. In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. Heggarty, 947 F.2d at 996. It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.

### 1. Pain

"Pain can constitute a significant non-exertional impairment." Nguyen, 172 F.3d at 36. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's six-part pain analysis and consider the following factors:

(1)     The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

(2)     Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

(3)     Type, dosage, effectiveness, and adverse side-effects of any pain medication;

(4)     Treatment, other than medication, for relief of pain;

(5)     Functional restrictions; and

(6)     The claimant's daily activities.

Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 29 (1st Cir. 1986). An individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

## 2.     Credibility

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. Rohrberg, 26 F. Supp. 2d at 309. A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. See Frustaglia, 829 F.2d at 195. The failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. See DaRosa v. Sec'y of Health and Human Servs., 803 F.2d 24 (1st Cir. 1986).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the

implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

## V.     APPLICATION AND ANALYSIS

Plaintiff was forty-nine years old on the date of the ALJ's decision.  (Tr. 39).  Plaintiff is a high school graduate and attended Parsons School of Design for about two years, but did not earn a degree.  (Tr. 42).  Plaintiff has no past relevant work.  (Tr. 33).  However, Plaintiff briefly worked as a pet groomer from August to October 2008 and as a floral designer from August to October 2001.  (Tr. 42, 154).  Plaintiff alleges disability due to congenital hip dysplasia, hip replacements, left ankle fracture, status post-open reduction and internal fixation, depression and a personality disorder.  (Tr. 39-41).

Around February 1988, Plaintiff underwent a left hip osteotomy for treatment of hip dysplasia.  (Tr. 236, 553).  She did well following this operation, and in October she underwent the same procedure for her right hip.  (Tr. 237-238).  In November, Dr. Robert Poss noted that Plaintiff was doing very well following surgery.  (Tr. 239).  In January 1989, Dr. Poss indicated that Plaintiff was ready for an increased activity level; she was having no hip pain but did have some night-time muscle discomfort around her hip.  (Tr. 240).  In October 1989, Dr. Poss noted that Plaintiff was "doing very well;" she was having minimal pain, taking no pain medication and "has been back to work for many months."  (Tr. 242).  In April 1990, Dr. Poss indicated that Plaintiff was now ready to undergo hardware removal surgery.  (Tr. 243).  She underwent hardware removal and scar excision on her left side in May.  (Tr. 597).  She underwent hardware removal on the right side in June.  (Tr. 599-600).

In June 2000, Dr. Poss noted that Plaintiff had done well for about ten years following her hip operations, but had begun to have problems over the two preceding years. (Tr. 257). She reported pain in both hips and said her walking distance was more limited; she tried to remain as active as she could. Id. X-rays in November showed moderate right and early left osteoarthritis of the hips. (Tr. 269).

In May 2001, Plaintiff told Dr. Elena Yanushpolsky that she still had issues with her hips. (Tr. 256). She also said she owned a horse and felt that horse riding was very good for her and for her general sense of well being; she was "very happy." Id. In October 2001, she told a nurse that she was having some anxiety over upcoming hip replacement surgery in January. (Tr. 330). In November 2001, she reported she had been involved in a motor vehicle collision two weeks previously and was still having sternal pain; this pain had not interfered with her activities, and she was still riding her horse. (Tr 331).

In October 2002, Plaintiff told Dr. Audrey Kupchan that she had done very well following hip replacement surgery, after having been in rehab for three weeks. (Tr. 332). Id. In December 2003, Plaintiff told Dr. Tesfaye Meren that she was having occasional problems with hives and had begun vomiting and suffering from diarrhea two days previously; no mention was made of hip problems. (Tr. 341). Plaintiff said she now had two horses and that she was working with both of them. Id. Dr. Meren noted that Plaintiff's mood was good. Id.

In March 2004, Plaintiff told Ms. Angela Carr, a physician's assistant, that she had been experiencing shortness of breath, with wheezing and coughing for a month. (Tr. 342). She had been taking care of horses at her barn, and thought that her problem might be due to moldy hay. Id. In July 2004, Plaintiff told Dr. Kupchan that she had been having joint pain (albeit not in her hips) for

about two months and that she was feeling very tired and gaining weight. (Tr. 348). She said she spent "hours every morning taking care of her 3 horses" and also riding. Id.

In January 2006, Plaintiff told Dr. Kupchan that she was having worsened pain in her ankle and as a result was thinking of undergoing surgery. (Tr. 353). She said that, despite this pain, she was currently very active with her horses and training and also had to do everything around the house because her husband had been laid off and had started a business out of their home. Id. She was taking Vicodin for her ankle pain. Id. In February 2006, Plaintiff was seen by Dr. Myerson to assess possible treatment of her left ankle. (Tr. 458-461). She told Dr. Myerson that she trained horses for a living "and is training them now and works with them." (Tr. 458).

She said this was "a very important part of her life" and that "she is unable to change her career or decrease the amount of riding she is doing." Id. Dr. Myerson did not think that either ankle replacement surgery or grafting were appropriate, given Plaintiff's young age and high activity level; he felt fusion (with modification of her riding boots) would be the most reliable way to provide pain relief but would cause significant limitation of motion. (Tr. 460). He recommended, for the present, continued conservative care, including utilization of her custom cowboy boots. (Tr. 461).

In February 2007, Plaintiff underwent a consultative examination conducted by Dr. Kenneth Morrissey. (Tr. 363-374). At that time, she told him that she only used a cane for walking "distances." (Tr. 374). In March 2007, she was seen by Dr. Christopher DiGiovanni, an orthopedist, in connection with her ankle pain (recently worsened by a mild twist injury). (Tr. 462-463). At this time, she described herself as a home maker who enjoyed horseback riding. (Tr. 462). Also in March, Mr. Henry Flikier, a clinical social worker, opined that Plaintiff remained "disabled in her

-14-

ability to function consistently in a work setting" due to depression and pain. (Tr. 378). In April 2007, Plaintiff told Dr. Kupchan that she had just gotten divorced; she had gotten "some alimony but not enough" and so was training horses a few hours a week, which aggravated her ankle pain. (Tr. 502).

In May 2007, Plaintiff underwent a consultative psychological examination conducted by Dr. Steven Hirsch. (Tr. 379). She told Dr. Hirsch that she had a limited occupational background. (Tr. 380). Findings on a mental status examination were essentially normal, other than seeming mildly anxious. Id. She reported episodic alcohol abuse, but said she was currently having only "a few glasses" on a daily basis. (Tr. 381). She said that she used to love riding horses, but that all her horses had been sold due to her divorce. (Tr. 381). Dr. Hirsch saw no limitations of daily activities, concentration or task persistence, but credited some limitation of social functioning. (Tr. 381-382).

In July 2007, Plaintiff told Dr. Kupchan that she remained depressed and anxious and financially stressed (still waiting to hear about disability benefits) and that her prescribed anti-depessant (Lexapro) was very expensive. (Tr. 504). She was moving in with her father to help take care of him. Id. She was having less ankle pain because she "hasn't been pounding her leg" and needed Vicodin only once or twice a day. Id. In August 2007, she told Dr. Kupchan that her disability claim had been denied and was being appealed and that she was feeling depressed and overwhelmed; her ankle was also bothering her more. (Tr. 506). In September 2007, Plaintiff told Dr. Kupchan that she was doing somewhat better and had been able to go riding occasionally; she was also going to Connecticut occasionally to visit her injured boyfriend. Id. She reported that she was finding it difficult to live with her father. Id. In October 2007, Plaintiff reported worsened ankle pain and severe menstrual cramps; she also said she had developed some muscular back pain.

(Tr. 508).  Dr. Kupchan suggested that she might need to use crutches rather than a cane when her ankle pain was aggravated.  Id.  She was currently riding very little and had been rejected again on her disability claim.  (Tr. 511).

In May 2008, Plaintiff told Dr. Kupchan that she would be going to Wisconsin to work on training horses and that she would move there if things worked out; she was managing her ankle pain on six to eight Vicodin a day.  (Tr. 514).  In November 2008, Plaintiff told Dr. Kupchan that the move to Wisconsin had not worked out, and that she was again living with her father; however, she was now able to keep a horse there.  (Tr. 516).  She was having worse ankle pain and had recently injured her right knee in a fall.  Id.  She said she had tried working as a dog groomer, but that it had required standing for hours.  Id.

In March 2009, Dr. Kupchan filled out a form indicating that she thought Plaintiff could not "sustain competitive employment on a full-time, ongoing basis." (Tr. 519, 520).  Dr. Kupchan also reported that Plaintiff's medications could cause possible sedation.  Id.  Dr. Kupchan described Plaintiff's pain as "severe." (Tr. 518, 520).

In March 2007, Dr. Erik Purins, a state agency physician, reviewed Plaintiff's medical records and concluded that there was not enough evidence to establish any ongoing disability commencing prior to September 30, 1990, but that Plaintiff was limited to light-level lifting with no more than two hours of standing and walking (and with the need to use a cane when walking on uneven surfaces).  (Tr. 366-373).  Dr. Harris Faigel, a medical consultant who reviewed the record in July 2007, agreed with this assessment.  (Tr. 422-423).

In June 2007, Dr. Clifford Gordon, a reviewing psychologist, concluded that, since 2006, Plaintiff had no significant deficits in understanding, attention or ability to adapt, but would show

inconsistent functioning when interacting with the public; there was insufficient evidence to show limitations at an earlier period. (Tr. 386, 398). Dr. Joseph Litchman, a psychologist who reviewed the record in December 2007, concurred with this assessment, (Tr. 414, 445), as did Dr. John Warren, a psychological medical consultant. (Tr. 427). Dr. John Bernardo, who reviewed the record in November 2007, provided a similar assessment. (Tr. 435-442).

## A.    The ALJ's Decision

The ALJ decided this case adverse to Plaintiff at Step 5. At Step 2, the ALJ found that Plaintiff's hip dysplasia, status post-bilateral hip replacement, status left ankle fracture and fixation surgery, depression and personality disorder are "severe" impairments as defined in 20 CFR §§ 404.1520(c) and 416.920(c). (Tr. 28). At Step 3, the ALJ determined that these impairments did not, singly or in combination, meet or medically equal any of the Listed Impairments. (Tr. 28-29). As to RFC, the ALJ found that Plaintiff was capable of performing a range of light work significantly limited by certain exertional, postural and nonexertional restrictions including moderate impairments in attention, concentration, and interpersonal activities. (Tr. 29-30). Finally, based on this RFC and testimony from the VE, the ALJ held that Plaintiff was not disabled because she could make a successful adjustment to certain unskilled sedentary jobs present in the economy. (Tr. 33-34, 63-64).

## B.    The ALJ's Step 5 Finding is Not Supported by Substantial Evidence

Plaintiff's first and primary argument is that there is not substantial evidence supporting the ALJ's Step 5 finding because his hypothetical to the VE failed to include all of the relevant supervisory limitations incorporated into the ALJ's RFC finding. In his lengthy RFC description, the ALJ made the following finding as to Plaintiff's ability to interact with supervisors. In

particular, he found a moderate impairment in dealing appropriately with supervisors and that Plaintiff could "deal appropriately with supervisors on an occasional basis (as where subject to normal monitoring and review of work in industrial settings), but not in circumstances in which, because of product considerations or for other reasons, monitoring and intervention by supervisors is physically close and/or frequent or continuous." (Tr. 30). The ALJ did not, however, incorporate this degree of limitation into the hypothetical posed to the VE at the hearing and thus Plaintiff argues that the ALJ's Step 5 finding is not supported by the record.

Defendant does not, and cannot on this record, dispute that the ALJ's hypothetical to the VE was inconsistent with his RFC finding. (Document No. 11 at p. 16). Rather, Defendant, in a single paragraph, attempts to construct a harmless error argument.[1]

At the hearing, the ALJ posed a lengthy and detailed hypothetical to the VE. (Tr. 62-63). As to supervision, the hypothetical stated only that Plaintiff "could deal with supervisors on an occasional basis." (Tr. 63). Based on the entire hypothetical, the VE opined that Plaintiff could perform certain unskilled sedentary jobs. (Tr. 63-64). The VE, however, testified that if the nonexertional limitations were "instead"[2] moderately severe, then Plaintiff would be precluded from performing those jobs. (Tr. 64).

It is important to keep in mind that the Commissioner bears the burden at Step 5 of establishing that Plaintiff can perform other work. See Wells v. Barnhart, 267 F. Supp. 2d 138, 144

---

[1] While the Argument section in Plaintiff's brief contains six discrete subsections and the flawed hypothetical argument is the first and primary argument for remand, the Commissioner's brief is not similarly organized into sections and deals with all of Plaintiff's claims in a single narrative-style argument. In addition, the Commissioner's brief reverses order and deals with Plaintiff's primary and strongest argument last in the very last paragraph of the argument section which suggests an attempt to divert the Court's attention from the argument or minimize its impact.

[2] While the ALJ's RFC references moderate nonexertional impairments, the operative hypothetical does not specifically describe the nonexertional limitations as moderate although that may be inferred from the ALJ's follow-up question to the VE. (Tr. 63-64).

(D. Mass. 2003). While the ALJ's hypothetical question to the VE included the advisory that Plaintiff could tolerate supervision on only an occasional basis, the question to the VE did not include the important language found in the RFC assessment further limiting Plaintiff's tolerance for supervision: "(as where subject to normal monitoring and review of work in industrial settings), but not in circumstances in which, because of product considerations or for other reasons, monitoring and intervention by supervisors is physically close and/or frequent or continuous." (Tr. at 30).

Defendant responds to Plaintiff's argument by stating that "Plaintiff correctly characterizes the ALJ's finding on this point" and conceding that the ALJ "did not add this specific proviso to the hypothetical." (Document No. 11 at p. 15). While admitting the error, Defendant attempts to explain away the deficiency by stating:

> Nonetheless, the fact that interaction with supervisors was limited in the hypothetical to no more than an occasional basis, the lack of physical closeness can reasonably be presumed - and did not need to be expressly included. It is hard to see how one could interact only occasionally with a supervisor who was physically close to one.

Id. at 15-16. Defendant argues that the limitation to "occasional" supervision accounts for the limitation that the supervision not be physically close. However, the limitation to "occasional" supervision, is one of frequency, whereas the limitation to supervision which is "not physically close," is one of proximity. Defendant's contention that this is harmless error is not convincing on this record. Plaintiff's occupational base was already significantly eroded in terms of her ability to stand, walk, sit, climb, balance, stoop, kneel, crouch, crawl, concentrate, persist, keep pace, and the frequency with which she can deal with coworkers, supervisors and the general public. It is possible that additional limitations may have further reduced Plaintiff's occupational base to the point where

a substantial number of jobs which she could perform no longer exists.  Without an opinion from the VE on this issue, the ALJ did not have an evidentiary basis for his Step 5 conclusion.

While this is a complicated case and presents a close call as to disability, I cannot accept Defendant's claim of harmless error on this record.  The ALJ included more substantial limitations in his RFC than those presented to the VE and thus the VE never opined on the impact of those limitations on Plaintiff's occupational base.  While the ultimate conclusion may not change after remand, the record, as it stands, simply does not contain substantial evidence to affirm the Step 5 denial in this case.[3]

## VI.    CONCLUSION

For the reasons discussed herein, I recommend that Commissioner's Motion for an Order Affirming the Decision of the Commissioner (Document No. 11) be DENIED and that Plaintiff's Motion to Reverse Without or, Alternatively, With a Remand for a Rehearing the Commissioner's Final Decision  (Document No. 7) be GRANTED.  Further, I recommend that Final Judgment enter in favor of Plaintiff remanding this case for further administrative proceedings consistent with this Decision.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its receipt.  See Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision.  See United States v. Valencia-

---

[3]    Plaintiff presents five other arguments for remand.  However, since Plaintiff's primary argument as to the hypothetical is clearly dispositive and warrants remand, the other arguments are effectively moot, and it would not be an efficient use of the Court's resources under these circumstances to fully analyze and write on all five of the alternative arguments for remand.

Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605

(1st Cir. 1980).


  /s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
March 30, 2012